# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMJAD ALI ALABED and SAMAH HUSSEIN, | Case No.  1:13-cv-2006-SKO |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | (Doc. 39) |
| JONATHAN CRAWFORD, et al., | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | (Doc. 40) |

## I.    INTRODUCTION

Plaintiffs Amjad Ali Alabed ("Alabed") and Samah Hussein ("Hussein") (collectively, "Plaintiffs") challenge the United States Citizenship and Immigration Service ("USCIS") denial of Hussein's I-130 Petition for Alien Relative on behalf of Alabed.  On February 4, 2015, the parties filed cross motions for summary judgment; on February 27, 2015, the parties each filed opposition briefs, and on March 20, 2015, the parties filed reply briefs.  (Docs. 39-44.)  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED and Plaintiffs' Motion for summary judgment is DENIED.

## II.   BACKGROUND[1]

**A.   Alabed's 1998 Marriage to Lourdes Murillo and the I-130 Petition for Alien Relative**

In May 1998, Alabed entered the United States as a visitor.  Before his visitor visa expired in December 1998, Alabed married Lourdes Murillo ("Murillo").  On December 16, 1998, 11 days after Alabed's visitor visa expired (AR 72, 582), Murillo filed an I-130 Petition for Alien Relative ("I-130 Petition") on Alabed's behalf for purposes of immigration and obtaining a relative visa.  Between December 1998 and July 2000, Murillo and Alabed offered the following evidence to support the I-130 Petition:  (1) an interim driver's license for Murillo; (2) evidence of a joint checking account for Murillo and Alabed; and (3) a copy of a 1999 joint income tax return filed with the IRS on July 13, 2000.  (AR 73.)

### 1.   Alabed's Relationship with Guillermina Botello Between 1998 and 2000

In considering Murillo's I-130 Petition on Alabed's behalf, USCIS obtained a law enforcement report from the Fresno Police Department dated January 20, 2000.  (AR 583.)  In the report, Alabed was identified as the victim of grand theft, and Alabed indicated to the police that his address at the time of the theft was 3313 N. Maple in Fresno, California (the "North Maple apartment").  (AR 583.)  Alabed reported the following to the police during the investigation of the theft:

> [Alabed] said he left his house on 1/20/00 at 1230 hrs.  He returned at 2030 hrs and discovered that property was missing from his house.  [Alabed] explained that when he left the apartment, his girlfriend, Gina Bottello [sic], who had just come by to visit, remained at his apartment . . . [Alabed] speculated that his girlfriend may have taken his property because picture [sic] of him and his girlfriend were ripped up and left on the dresser.

(AR 837-38.)

On February 14, 2000, USCIS issued a subpoena to the U.S. Postal Inspectors Office seeking address information related to Murillo and Alabed's past and current residences.  (AR 796.)  In light of Alabed's statement to the police regarding his relationship with Guillermina Botello ("Botello"), on February 29, 2000, a USCIS special agent went to Botello's place of

---

[1] The background section is drawn from the Administrative Record (the "Record" or "AR").

employment to interview her regarding her relationship with Alabed.  (AR 775.)  Botello stated that she had been Alabed's girlfriend from May 1998 to December 1999, and that Alabed had asked her to marry him on several occasions, but she had told him she would only marry someone for love.  (AR 775-76.)  Botello stated she later discovered Alabed had married someone for immigration purposes and had paid her $5,000.  (AR 776.)  Botello also stated that she found negatives and pictures of what appeared to be Alabed marrying a Palestinian woman.  (AR 776.)  When she confronted Alabed about the pictures, he had grabbed her and started to choke her.  (AR 776.)  The police were called to the scene, but no report was taken.  Botello claimed she was later treated at Fresno Community Hospital.  (AR 776.)  She also claimed that Alabed had been stalking her and threatening her life requiring her to seek a restraining order against him which was issued on February 23, 2000.  (AR 776.)  Botello showed the investigator the pictures and negatives of Alabed's vacation in Palestine, and stated the investigator could keep them because Botello had no need for them.  (AR 777.)

On March 9, 2000, Botello informed the special agent that Botello had a statement from PG&E in Botello and Alabed's names jointly (AR 772), and that she and Alabed were jointly-registered renters at Hollywood Video when they lived together at the North Maple apartment. (AR 773.)  The USCIS agent personally served Hollywood Video with a subpoena requesting the existence of "renter information" for Botello and Alabed.  (AR 790).  The assistant manager checked the record and stated that Alabed and his fiancée Botello had been registered renters since October 31, 1999, and had listed the North Maple apartment as their residence address.  (AR 773, 793.)  On March 10, 2000, the special agent served PG&E with a subpoena via facsimile requesting subscriber information from November 1999 through present for the North Maple apartment.  (AR 770-71.)  PG&E faxed information to USCIS showing the dates of service for the North Maple apartment that listed both Botello and Alabed's names and a forwarding address to East Iowa Avenue in Fresno.  (AR 778-82.)

On June 28, 2000, USCIS obtained a sworn statement from Botello regarding her involvement with Alabed.  (AR 755-60.)  Botello claimed that she had started living with Alabed at the North Maple apartment in Fresno in January 2000 (AR 757, ¶¶ 11-12), and that their

relationship began in June 1998 (AR 756, ¶¶ 8-9).  Botello claimed they were living together in January 2000 because they were planning to marry, and she was "going to" move all her personal belongings into the North Maple apartment.  (AR 756, ¶ 10.)  Botello also claimed the apartment was rented in the name of Alabed's cousin because Alabed had left his prior residence in poor condition.  (AR 756, ¶ 10.)  She claimed that the PG&E bill for the North Maple apartment was in both their names.  (AR 756, ¶ 10.)

Botello claimed Alabed asked her to marry him in June 1998, she agreed, and they had planned to get married in February 1999.  (AR 757, ¶ 13.)  Alabed told Botello that he wanted to marry her "as long as the immigration did not know about it."  (AR 757, ¶ 13.)  She made arrangements at a wedding chapel near Ventura Street in Fresno, but they separated the day after Thanksgiving,[2] apparently because Alabed would not agree to meet Botello's family.  (AR 757, ¶ 13.)  The couple ostensibly later reconciled, and Botello claimed they started living together at the North Maple apartment because they planned to marry.  (AR 757, ¶ 10.)

Regarding the January 20, 2000, incident in which Alabed was identified as a victim of grand theft, Botello claimed she was cleaning the North Maple apartment, Alabed had a briefcase in a closet, and Botello noticed that there was a paper sticking out.  (AR 757, ¶ 15.)  Botello pulled on the edge of the paper and out "with it came some negatives."  (AR 757, ¶ 15.)  She took the negatives into the kitchen, and could tell that Alabed "was in these pictures."  (AR 757, ¶ 15.)  She took the negatives to be developed, but she was told "they would not have the pictures developed until the next day."  (AR 757-58, ¶ 15.)  Botello had called Alabed's family to find out when he was going to be home, and upon his arrival at the North Maple apartment, he "let [Botello] into the apartment," and he noticed that she "was not looking well."  (AR 758, ¶ 15.)  Alabed then "took [Botello] into the bedroom and covered [her]," and then left to get food.  (AR 758, ¶ 15.)  After he left, Botello put some of the pictures she found around the apartment.  (AR 758, ¶ 15.)  Botello put all her belongings in the car and left the apartment.  She called her sister and asked her sister to go back to the apartment to "see if the door was open."  (AR 758, ¶ 15.)  Botello's sister went to the apartment, met Alabed, and was told that "he could not believe that [Botello] would steal from

---

[2] It is unclear from the testimony whether Botello was referring to Thanksgiving in 1998 or 1999.

him.  He told her he was going to call the police."  (AR 758, ¶ 15.)  Botello claimed she called the police the next morning to explain what had really happened and that she was not interested in taking anything that belonged to Alabed.  (AR 758, ¶ 15.)  Three days later, Botello claimed she and Alabed met at a restaurant where he asked for forgiveness and explained that he had married another woman from his country in 1999 because he had pledged to do so in 1993.  (AR 758, ¶ 15.)

Botello stated Alabed had asked her four or five times to marry him for $5,000 in order to "fix his immigration papers," but she refused to "marry anyone just to fix their immigration papers."  (AR 758-59, ¶¶ 18-19.)  Botello claimed that "the woman [Alabed] married in October of 1998" had helped Alabed with his immigration status.  (AR 759, ¶ 19.)  She also claimed that Alabed took a trip to Jerusalem in 1999, which Alabed later told her was for the purpose of marrying the woman to whom he had been pledged since 1993.  Botello claimed she did not know that Alabed had gone to Jerusalem to get married until after she found the negatives and the pictures in their apartment.  (AR 759-60, ¶ 21.)

### 2.    USCIS' Consideration of Murillo and Alabed's I-130 Petition

On June 29, 2000, USCIS sent a notice by mail to Murillo and Alabed requiring them to appear for an interview before an Immigration Examiner regarding the I-130 Petition.  (AR 72.)  They appeared on July 14, 2000, and were interviewed separately.   During these interviews, Alabed and Murillo gave inconsistent answers to questions regarding their marriage such as where they had lived since their marriage, and gave different answers regarding the details of an international trip Alabed had taken in 1999.  Murillo stated the following with regard to their joint addresses:

| | |
|---|---|
| 10/1998 – 2/2000 | Resided at 3294 E. Dakota Avenue, #215 in Fresno, California |
| 2/2000 – 4/2000 | Resided at 3313 N. Maple, #115 in Fresno, California |
| 4/2000 – 7/14/2000 | Currently reside at 1023 W. Garland in Fresno, California |

(AR 583.)  Alabed gave the following joint addresses for himself and Murillo:

| | |
|---|---|
| 10/1998 – 11/1999 | Resided at 3294 E. Dakota Avenue in Fresno, California |
| 11/1999 – 7/14/2000 | Currently resides at 1023 W. Garland in Fresno, California |

(AR 583.)  When asked questions about Alabed's trip overseas between June and August 1999, Alabed stated that when he returned to the United States, Murillo picked him up at the Los Angeles airport and they both returned to Fresno together.  (AR 563.)  Murillo stated that three hours before Alabed arrived at their apartment, he had called her to tell her he had arrived and was on his way home.  (AR 583.)  She stated she did not pick him up at the airport.  (AR 583.)  When confronted with these inconsistencies, Murillo admitted in a sworn statement that Alabed had paid her $3,000 to marry him and that they married for the sole purpose of obtaining permanent residence for Alabed.  (AR 480-81, 584-85, 807-10.)

On July 20, 2000, USCIS issued a decision denying Murillo's I-130 Petition on behalf of Alabed.  (AR 72-75.)  The denial was based on the discrepancies in Murillo's and Alabed's responses about their joint residential history and details about Alabed's trip to Palestine in 1999 (AR 72-73); Botello's signed sworn statement indicating she and Alabed had been in a relationship since May 1998, and that he had offered her money to marry him so that he could "fix his immigration papers" (AR 480); and documentation obtained by the agency corroborating Botello's statements consisting of a joint PG&E account for Botello and Alabed from November 1999 through March 2000, and Hollywood Video account information that Alabed and Botello had a joint account from October 31, 1999, to March 10, 2000, listing the North Maple apartment as their address (AR 480).

The USCIS' decision also noted that Murillo had admitted in a sworn statement that her marriage to Alabed was not bona fide, that she had never cared for Alabed, never lived with him, they had never consummated the marriage (AR 73, 808-10), and Murillo agreed to marry Alabed so that he could obtain his permanent residency for which he would pay her $3,000 (AR 73, 808-10).  After receiving the letter from USCIS requiring Murillo and Alabed to appear for an immigration interview, Murillo indicated in her sworn statement that Alabed began trying to locate her and, after threatening Murillo's brother, Alabed found her and they made arrangements to come together to the immigration interview.  (AR 73, 810.)

Upon consideration of the evidence, USCIS determined the marriage between Murillo and Alabed was fraudulent.  (AR 74-75.)  There is no evidence this decision was appealed by Murillo.

**B.      Alabed's 2004 Marriage and the 2008 I-130 Petition for Alien Relative**

In July 2004, Alabed married Samah Hussein ("Hussein"), a citizen of the United States. On June 5, 2008, Hussein filed an I-130 Petition on Alabed's behalf.  On February 13, 2009, the USCIS mailed a Notice of Decision denying Hussein's petition to Alabed and Hussein.  The denial was based on a determination that Alabed's previous marriage to Murillo was fraudulent.  Hussein and Alabed appealed the decision to the Board of Immigration Appeals (the "Board"), and the matter was remanded to USCIS on March 31, 2009, because USCIS had not issued a Notice of Intent to Deny ("NOID") prior to issuing the February 2009 decision.

On September 14, 2010, USCIS again denied the I-130 application, finding that Alabed's previous marriage to Murillo was fraudulent.  (AR 207-12.)  The decision indicated a NOID had been issued on July 27, 2010, but USCIS had received no response.  Plaintiffs again appealed the USCIS decision to the Board.  (AR 476-77.)  The Board noted that, prior to USCIS' September 2010, decision, a NOID was sent on July 27, 2010, to Plaintiffs at an address in Calabasas, California.  (AR 476.)  This Calabasas address was the address reflected on several forms submitted by Plaintiffs between March 2009 and October 2010.

On July 27, 2011, Plaintiffs submitted new evidence on appeal, which included a new form with letterhead reflecting an address for Plaintiffs' counsel in Bronx, New York.  (AR 476.)  The Board determined that "out of an abundance of caution . . . the record will again be remanded" so that a NOID could be issued to Plaintiffs at the newest address for their counsel, and the parties were given an opportunity to submit additional information and supplement the record with any additional evidence related to Alabed's marriage to Murillo.  (AR 477.)

On February 23, 2012, USCIS issued a NOID stating it intended to deny Hussein's I-130 Petition.  (AR 478-82.)  USCIS again found Alabed's prior marriage to Murillo to be fraudulent and for the purpose of evading immigration laws.  (AR 481.)  USCIS cited the inconsistencies between Murillo's and Alabed's answers to questions during their separate interviews in July 2000, a police report from January 2000 where Alabed stated Botello was his girlfriend, Botello's sworn statement, PG&E and Hollywood Video evidence corroborating Botello's sworn statement, and Murillo's statement that Alabed had offered her money to marry him and help him obtain

permanent residence in the United States.   (AR 478-81.)   The NOID concluded by offering

Hussein the opportunity to submit further evidence to support the I-130 Petition and to address the

evidence of marriage fraud USCIS identified.  (AR 482.)

On March 22, 2012, Plaintiffs submitted evidence to rebut the evidence of fraud cited by

USCIS.  (*See* AR 494, 537-80.)  Plaintiffs submitted a declaration from Murillo, dated February

10, 2012, stating the following in relevant part:

> 2.   I provide this declaration in support of Amjad Alabed.
>
> 3.   I married Amjad a long time ago.  When we were married, I was very young and he was one of my first relationships.
>
> 4.   I knew that Amjad was cheating on me and it really upset me.  I couldn't take it any longer.   I made up statements to immigration, so Amjad wouldn't get his papers.
>
> 5.   In retrospect, I feel really bad about what I did, but I was upset.  I felt completely disrespected that Amjad was cheating on me and I wanted to get back at him.

(AR 501.)

Plaintiffs submitted a February 24, 2012, declaration from Botello that provides in relevant

part:

> 3.   [Amjad] never talked about getting married and he never asked me to marry him for money, I knew he was married to Lourdes.
>
> 4.   When Amjad lived at the Maple street apartments, I used to go visit him there.  I did not live there with him.  He lived with his wife, although they were having problems and she was never there, that's when we started dating.  It was off and on.  When him [sic] and his wife were having problems, I would go there.
>
> 5.   Sometime in January 2000, we had a huge argument about his wife.  I got mad and left his apartment.  I was so angry that I turned him over to the Immigration.
>
> 6.   It was not right because we did not talk about marriage, but I guess I was really emotional.

7.   Immigration asked me to go to them on June 28, 2000.  When I went there, they asked me if I was related to Amjad.  I told them that we dated but I was not related to him.

8.   They asked me if I knew that he was married and I said no, but that was not the case.  I did know that he was married.  That was it.  I did not say anything else to them.

Plaintiffs submitted an affidavit signed by Gloria Castillo stating the following in relevant part:

That [Alabed] was married[] to [Murillo].  [Murillo] was my very good friend.  I knew her before she met her husband [Alabed].  I met [Alabed] a little bit after they got together.  When [Alabed], was married to [Murillo] they would come to my house to visit several times and I went to their house.  I remember [Murillo] was very mean to [Alabed].  Sometimes she would talk mean to him and was always speaking Spanish behind his back in front of him, saying he was stupid.  I used to feel sorry for him, because he would never say anything to her, even when she would just yell and yell.

(AR 499.)

Nasser R.A. Rabah signed an affidavit stating the following in relevant part:

[Alabed], was married, at one time to [Murillo].  I know [Alabed] since he was a kid.  When [Alabed] was [m]arried to [Murillo] we would frequently go out to dinner and also to the Casino.  I also specifically remember going out to several parties with them when they were married.

(AR 506.)

Ziadatif Youns signed an affidavit stating the following in relevant part:

I know [Alabed] [s]ince his birth.  [Alabed] is my uncle.  Beside him being my uncle[,] we have always been close friends.  I also knew his ex-wife [Murillo].  My wife and I invited them over several times for dinner.  There were occasions when we went out together as couples on the weekend.

(AR 507.)

Iad Atef Younes also submitted an affidavit stating the following in relevant part:

[Alabed] is my uncle and we grew up together and have remained very close.  Therefore, I can certify that he was married to [Murillo].  In fact[,] I attended their engagement party and wedding.  During the time that they were married[,] I kept in contact with him and would occasionally visit.

9

(AR 508.)

On April 3, 2012, USCIS issued a decision denying Hussein's I-130 Petition on Alabed's behalf.   (AR 490-96.)   USCIS found that the marriage between Murillo and Alabed was fraudulent, for the purpose of evading immigration laws, and sought to illegally confer immigration benefits on Alabed.  (AR 493.)  USCIS considered the new evidence submitted by Plaintiffs, including the declarations and affidavits of Alabed's relatives, Castillo, Murillo, and Botello.  (AR 494-95.)  Regarding Murillo's declaration, USCIS noted

> This declaration fails to contain any identifying information.   This declaration also fails to address the contradictory testimony she provided on July 14, 2000.  Lourdes Murillo only admitted to the fraudulent marriage after she was confronted by a Service Officer regarding her conflicting testimony on July 14, 2000.  If her new declaration is true and she only wanted to hurt [Alabed] for cheating on her, why then did she attempt to provide false statements in an attempt to prove a bona fide marriage?  The record of July 14, 2000, indicated Lourdes Murillo was initially attempting to protect [Alabed], not hurt him as her new declaration argues.  The submission of this new declaration simply raises new issues which are unresolved.

(AR 495.)  Regarding Botello's new declaration retracting her June 2000 sworn statement, USCIS noted:

> The declaration submitted by Guillermina Botello dated February 24, 2012, contradicts her testimony under oath on June 28, 2000.  The declaration dated February 24, 2012 states that she never talked about getting married to [Alabed] and he never asked her to marry him for money.  Guillermina Botello now has indicated she intentionally withheld the truth on June 28, 2000, regarding [Alabed's] marital status at that time.  [Botello's] admission of presenting false testimony of June 28, 2000, renders her declaration not credible.  Furthermore, this declaration is also not supported by any corroborating evidence.

(AR 495.)

As to the remainder of the declarations and affidavits, USCIS concluded they were submitted without any supporting documentation, failed to provide any objective or credible evidence of a bona fide marriage, and were entirely unsubstantiated by material fact.  (AR 495.) The affidavits from Alabed's family members were also found to be "self-serving evidence" and were not credited by USCIS.  (AR 495.)

Plaintiffs appealed USCIS' decision to the Board.   On October 21, 2013, the Board determined that substantial and probative evidence existed that Alabed's prior marriage to Murillo

10

1  was entered into for the purposes of evading the immigration laws.  (AR 434-35.)  The Board

2  found the prior marriage was a sham marriage and dismissed Plaintiffs' appeal.  (AR 435.)

3      On December 6, 2013, Plaintiffs filed a complaint in this Court challenging USCIS'

4  decision and the Board's dismissal of Plaintiffs' appeal pursuant to the Administrative Procedure

5  Act ("APA"), 5 U.S.C. §701.  (Doc. 1.)

6                          **III.   LEGAL STANDARD**

7      Under the APA, a reviewing court may set aside a final agency decision if it is "arbitrary,

8  capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C.

9  § 706(2)(A).  The standard of review under Section 706(2)(A) is deferential, and a court is not

10  empowered to substitute its judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n v. State*

11  *Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court must conduct a "searching and

12  careful" inquiry into the facts, but "the ultimate standard of review is a narrow one."  *Citizens to*

13  *Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by*

14  *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

15      In reviewing an agency's decision under Section 706(2)(A), a court "must consider whether

16  the decision was based on a consideration of the relevant factors and whether there has been a

17  clear error of judgment."  *Volpe*, 401 U.S. at 416.  The agency must have considered the relevant

18  data and "articulate a satisfactory explanation for its action including a 'rational connection

19  between the facts found and the choice made.'"   *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43

20  (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  To uphold "an

21  agency decision under the arbitrary and capricious standard, a court must find that evidence in

22  front of the agency provided a rational and ample basis for its decision."  *Nw. Motorcycle Ass'n v.*

23  *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  Under the APA, a district court's review

24  is limited to the administrative record to determine whether the federal agency considered relevant

25  factors and reached conclusions that were not arbitrary or capricious.  *Id.* at 1472.

26      Under the APA, a court can review agency decisions on a motion for summary judgment.

27  *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 770 (9th Cir. 1985).  The reviewing court, however,

28  "is not required to resolve any facts in a review of an administrative proceeding."  *Id.* at 769.

1  Instead, the court is limited to the evidence in the administrative record, with few exceptions for

2  discovery. *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007). Reviewing only

3  the administrative record, the district court "is to determine whether or not as a matter of law the

4  evidence in the administrative record permitted the agency to make the decision it did."

5  *Occidental Eng'g Co.*, 753 F.2d at 769. In applying this standard, a court must be "highly

6  deferential, presuming the agency action valid," and the court must not "substitute its judgment for

7  that of the agency." *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007) (internal

8  quotations and citation omitted).

9  **IV.    DISCUSSION**

10 **A.    Applicable Law**

11     For an alien spouse of a United States citizen to obtain lawful permanent resident status,

12 the United States citizen spouse must file a Form I-130 Alien Relative Petition on behalf of the

13 alien spouse beneficiary to classify him as an "immediate relative." 8 U.S.C. § 1154(a)(1)(A)(i).

14 Immediate relatives, which include spouses, of a United States citizen are not subject to the annual

15 quotas imposed on other family-based immigration classifications and may jump the line by

16 immediately applying for lawful permanent resident status. 8 U.S.C. § 1151(b)(2).

17     The United States citizen spouse bears the burden of proving that the noncitizen

18 beneficiary is eligible to receive the benefits of the I-130 visa petition. 8 U.S.C. § 1361; *see also*

19 *Gipson v. I.N.S.*, 284 F.3d 913, 915 (8th Cir. 2002). The citizen's spouse must provide evidence of

20 her citizenship along with a valid certificate of marriage and proof of the legal termination of all

21 previous marriages of both the citizen spouse and the beneficiary spouse. 8 C.F.R. § 204.2(a)(2).

22 Once "a petitioner of an immediate relative petition proves that his marriage meets the

23 requirements for the approval of an I-130, he is entitled, as a matter of right, to the approval of his

24 petition." *Ching v. Mayorkas*, 725 F.3d 1149, 1155 (9th Cir. 2013.) "The decision of whether to

25 approve an I-130 visa petition is a nondiscretionary one." *Id.*

26     The beneficiary spouse of an I-130 visa petition, however, is not eligible for immediate

27 relative status if the marriage on which the petition is based was a sham marriage entered into for

28 the purpose of evading marriage laws. 8 U.S.C. § 1154(c); *Vasquez v. Holder*, 602 F.3d 1003,

1014 (9th Cir. 2010) ("[A] marriage that is entered into for the primary purpose of circumventing

the immigration laws, referred to as a fraudulent marriage, does not enable an alien spouse to

obtain immigration benefits." (quoting *Matter of McKee*, 17 I. & N. Dec. 332, 1980 WL 121883

(BIA 1990))).  This also applies to any prior marriage found to have been entered into for the

purpose of evading immigration laws:

> Notwithstanding the provisions of subsection (b) of this section no petition shall be
> approved if (1) the alien has previously been accorded, or has sought to be
> accorded, an immediate relative or preference status as a spouse of a citizen of the
> United States . . . , by reason of marriage determined by the Attorney General to
> have been entered into for the purpose of evading the immigration laws or (2) the
> Attorney General has determined that the alien has attempted or conspired to enter
> into a marriage for the purpose of evading the immigration laws.

8 U.S.C. §1154(c).

To deny an I-130 visa petition based on marriage fraud, the USCIS must find that there is

"substantial and probative evidence" that the marriage was a sham – a "reasonable inference" is

insufficient.  *Damon v. Ashcroft*, 360 F.3d 1084, 1088 (9th Cir. 2004).  It is the Government's

burden of establishing substantial and probative evidence that the prior marriage was a sham.

*Matter of Kahy*, 19 I. & N. Dec. 803, 806, 1988 WL 235464 (B.I.A. 1988) ("[W]here there is

evidence in the record to indicate that the beneficiary has been an active participant in a marriage

fraud conspiracy, the burden shifts to the petitioner to establish that the beneficiary did not seek

nonquota or preference status based on a prior fraudulent marriage.").

If USCIS discovers substantial evidence related to marriage fraud, it must issue a Notice of

Intent to Deny ("NOID") to the petitioner.  8 C.F.R. § 103.2(b)(8)(iv).  Substantial evidence is

"more than a scintilla, but . . . something less than a preponderance of the evidence."  *Fla. Gas

Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).  "The NOID informs the

petitioner of 'the derogatory information' in question and affords him the 'opportunity to rebut the

information and present information in his/her own behalf before the decision is rendered.'"

*Zemeka v. Holder*, 989 F. Supp. 2d 122, 130 (D.D.C. 2013) (quoting 8 C.F.R. § 103.2(b)(8)(iv),

(b)(16)(i)).  Upon receiving the NOID, the burden shifts to the petitioner to rebut USCIS' finding

of fraud and establish that a prior marriage was not "entered into for the purpose of evading

immigration laws."  *See Matter of Kahy*, 1988 WL 235464, n.2 ("Even if his current marriage is unquestionably bona fide, however, the visa petition cannot be approved if the beneficiary sought to be accorded nonquota status based on a prior fraudulent marriage.").

Upon receiving a response to the NOID, if any, USCIS determines whether the I-130 petition should be approved.  6 U.S.C. § 271(b); 8 C.F.R. § 204.2(a)(1)(ii).  USCIS' decision may be appealed to the Board of Immigration Appeals, 8 C.F.R. § 1204.1, and the Board's decision may be challenged in federal district court.  The USCIS' denial of an I-130 petition based on a fraudulent marriage "will stand if the record reveals a rational basis" for the agency's decision. 8 U.S.C. § 1101.

**B.**     **USCIS' Decision was Not Arbitrary and Capricious and Defendants are Entitled to Summary Judgment Under the APA**

      **1.**     **There is Substantial and Probative Evidence Showing Alabed and Murillo's Marriage Was a Sham**

In deciding whether the beneficiary entered into his prior marriage for the purpose of procuring admission as an immigrant to the U.S., the focus is whether the beneficiary and the former spouse intended to establish a life together at the time they were married.  *See Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir. 1975).  Objective evidence supporting a finding that a couple entered into marriage with an intent to establish a life together may include such things as listing a spouse on insurance policies as the beneficiary, property leases, income tax forms or bank accounts, testimony or other evidence regarding courtship and a wedding ceremony, and evidence concerning whether the couple shared a residence.  *Nakamoto v. Ashcroft*, 363 F.3d 874 (9th Cir. 2004); *see also Malhi v. I.N.S.*, 336 F.3d 989, 994 (9th Cir. 2003) ("[A]n applicant must offer evidence that is probative of the motivation for marriage, not just the bare fact of getting married.").  Although evidence that the parties separated after the marriage is relevant in ascertaining whether they intended to establish a life together at the time of marriage, evidence of separation cannot, by itself, support a finding that the marriage was not bona fide.  *Bark*, 511 F.3d at 1202.

Here, USCIS had substantial and probative evidence that Alabed and Murillo did not intend to establish a life together at the time they were married in October 1998.  Botello's sworn

statement indicates she was involved with Alabed in a romantic relationship by June 1998 and that they remained involved until sometime in early 2000.  (AR 756-57.)  Thus, at the time Alabed married Murillo, he was in a relationship with someone else.  Alabed himself referred to Botello as his girlfriend in January 2000 when giving a statement to the police regarding an alleged theft in his apartment.  (AR 836-39.)  Botello claimed that by January 2000, she and Alabed were living together, and there is a PG&E account statement showing both their names on the account for the residence where Botello stated she and Alabed lived.  (AR 769, 772-73, 778-82.)  Botello and Alabed also maintained a Hollywood Video joint rental account since October 1999.  (820, 793.) Botello stated Alabed had asked her to marry him for money to "fix" his immigration problems, but she had refused to marry for that reason.   (AR 758-59.)  She asserted they had planned to marry in February 1999, but that they broke up in 1998 for a period of time around Thanksgiving. (AR 757.)  Although the nature of Alabed and Botello's relationship between 1998 and 2000 – whether they were engaged or living together – is not dispositive of Alabed's intent to establish a life with Murillo when he married her in October 1998, the fact that Botello and Alabed were undisputedly involved in a relationship in or around June 1998 and at the time Alabed married Murillo is probative evidence of Alabed's intent.

Further probative evidence of Murillo and Alabed's motivation to marry was obtained at their July 2000 immigration interviews.  When interviewed separately about their life together, Alabed and Murillo were unable to consistently answer routine questions such as their joint residential history and simple details related to Alabed's 1999 overseas trip.  For example, Murillo listed three addresses for their joint residential history, including the North Maple apartment, while Alabed entirely omitted mention of the North Maple apartment which he apparently shared with Botello for some period of time in early 2000.  Additionally, Murillo stated that she did not pick up Alabed at the airport when he arrived home from his trip in 1999, while Alabed stated that she had driven to Los Angeles to pick him up from the airport.   When confronted with inconsistencies in their answers, Murillo confessed that she had married Alabed for $3,000, she had never loved him, they had never lived together, and they had never consummated their relationship.   Not only are Alabed and Murillo's inconsistent answers evidence they were not

living together as they initially told USCIS, Murillo's sworn admission that her marriage to Alabed was not bona fide is substantial and highly probative evidence that Murillo and Alabed *did not* intend to establish a life together in October 1998 when they were married.

Finally, as USCIS noted, there is very little evidence that Alabed and Murillo had a bona fide marriage.  The documentation they submitted to USCIS, which included a joint tax return and a blank check reflecting a joint checking account, was very basic and can easily be obtained.  Murillo's driver's license was issued only two days before their July 2000 interview and appeared to have been obtained for the sole purpose of providing it to the interviewing officer; otherwise the document would have likely been obtained two years earlier when the couple married.  They provided no pictures of their wedding, wedding invitations, or anything that would show their intent to establish a life when they were married in October 1998.  *See Sharma v. Holder*, 633 F.3d 865, 872-74 (9th Cir. 2011) (evidence of couple commingling some funds and adding spouse's name to some agreements along with basic affidavits containing few details of the relationship or rationale for marriage insufficient to establish bona fide marriage).

Considered together, this evidence more than satisfies USCIS' burden of showing substantial and probative evidence of marriage fraud.  Plaintiffs, however, argue that each piece of evidence USCIS cited to support its decision is flawed to the degree that there is no rational basis to support the USCIS' decision, and thus its sham marriage finding is arbitrary and capricious.

        a.       **Botello's Statement and Other Substantial and Probative Evidence Establish Botello and Alabed were Engaged in a Romantic Relationship at the Time Alabed Married Murillo in October 1998**

Plaintiffs assert that Botello's June 2000 sworn statement is replete with inconsistencies such that it cannot be considered credible evidence.  For example, in her sworn statement, Botello indicated she lived on East Iowa Avenue in Fresno from August 1999 through June 28, 2000, but later she indicated she lived at the North Maple apartment from January to February 2000.  Botello claimed she moved in with Alabed at the North Maple apartment in January 2000 because they were planning on getting married, but also said they had planned to be married in February 1999.  She stated that Alabed proposed in June 1998, and she said yes and called someone to make

arrangements, but she also claimed that Alabed did not want immigration to know about it. Plaintiffs note that at that time, Alabed was not married and had not filed anything with immigration.  Alabed did not marry Murillo until October 1998, thus there was nothing to hide from immigration when Alabed proposed to Botello in June 1998.  Botello alleged that she was cleaning Alabed's apartment at North Maple on January 20, 2000, and states that she took negatives of the photos she found to get developed and that they would not be ready until the next day, but she also describes putting pictures all over the apartment without explaining from where she got those pictures.  She also stated Alabed let her into the apartment at that time, but there is no explanation why, if she lived there, she had to be let into the apartment.  Additionally, Botello stated that Alabed asked her four or five times to marry him to help with his immigration, but she said no because she wanted to marry for love.  However, this contradicts her statement that when Alabed asked Botello to marry him in June 1998, she said yes and they planned a February 1999 wedding.  The statement that he offered her money in exchange for her agreement to marry and her alleged refusal contradicts her testimony about his proposal in June 1998.  According to Plaintiffs, Alabed had no reason to ask Botello to marry him after October 1998 because he was married to Murillo and, according to Botello, by June 1998 she had already agreed to marry him in 1999.  Thus, Botello's June 2000 statement is too vague and contradictory to be credited.

The inconsistencies in Botello's testimony relate largely to the specific details of her relationship with Alabed – whether she had actually moved into the North Maple apartment with Alabed, the specific details of their argument and the photos she discovered in the North Maple apartment in January 2000, and how and when she and Alabed planned to marry.  The undisputed fact remains, however, that she and Alabed were involved in a romantic relationship in 1998 and at the time Alabed married Murillo in October 1998.  Moreover, even if Botello's statements where wholly disregarded, the remaining evidence before USCIS is substantial and probative.

Plaintiffs contend that while the PG&E account statement shows service at the North Maple apartment, it lists a *mailing address* to Botello's residence on East Iowa Avenue, which suggests she was not actually *living* with Alabed.  Plaintiffs also argue the Hollywood Video "evidence" is merely a handwritten notation that Alabed and Botello had a joint account there

1   since October 1999.  The note is not authenticated, and it is unclear who wrote it.  The particular

2   details of Alabed and Botello's relationship – whether they shared a Hollywood Video account and

3   whether they actually lived together at the North Maple apartment – bears very little on whether

4   Alabed and Murillo married with the intent to establish a life together.  However, the evidence is

5   probative to show that Alabed and Botello were involved in a relationship, which is confirmed by

6   the jointly held PG&E bill and Hollywood Video joint account, regardless whether Botello

7   actually *lived* at the North Maple apartment.  Moreover, Alabed referred to Botello as his

8   girlfriend when he reported an alleged theft to the police in January 2000.  Even without the

9   PG&E account statement or the handwritten notation of a joint account purportedly from

10  Hollywood Video,[3] Alabed's own statement to the police corroborates Botello's assertion that they

11  were in a relationship.  Moreover, Alabed has never disputed that he and Botello were involved in

12  a relationship as early as 1998.  The fact that Alabed was involved with Botello at the time he

13  married Murillo is strong evidence of whether Alabed intended to establish a life with Murillo

14  when he married her.

15          **b.      Alabed and Murillo's Inconsistent Interview Responses is Substantial**
16                  **Evidence of a Sham Marriage**

17          Plaintiffs assert that the inconsistent way that Murillo and Alabed answered questions in

18  their July 2000 interviews with USCIS is not substantial evidence of fraud.  Plaintiffs maintain

19  Alabed must have simply forgotten that he and Murillo had lived at the North Maple apartment,

20  and his omission of this address in no way suggests or shows their marriage was not bona fide.

21  Plaintiffs note that at the interview both Alabed and Murillo were able to consistently draw

22  pictures of the inside of the residence they allegedly shared.

23          The fact that Alabed and Murillo were able to consistently answer *some* questions,

24  however, must be considered in light of the discrepancies in answers to very simple questions.

25

26  [3] The Court notes that, while the notation indicating a joint account for Botello and Alabed at Hollywood Video does
    not contain any identifying information about who authored the note (AR 793), a USCIS special agent described how
27  she obtained this evidence pursuant to a personally served subpoena:  "On 03/10/00, this reporting officer personally
    served Hollywood Video with a subpoena requesting the existence of renter information for BOTELLO and [Alabed].
28  Assistant Manager, Holly Levandowski checked the record and stated that [Alabed] and his fiancée, Gina BOTELLO
    (DOB: 06/25/68) have been renters since 10/31/99."  (AR 820.)

The discrepancies in answers were an indication that Alabed and Murillo were not being forthright about their relationship.  Moreover, Alabed never disclosed his relationship with Botello to USCIS, even though he was interviewed separately from Murillo, and the fact that he omitted his North Maple residence – one where Botello had at least visited and where he and Botello held a joint PG&E account for service – is probative of Alabed and Murillo's intent when they married in October 1998.

### c.       There is No Convincing Basis to Question the Accuracy of Murillo's July 2000 Statement

Plaintiffs assert that Murillo's July 2000 statement that she married Alabed for money and that she never loved him or lived with him is questionable because it was handwritten; the questions and answers are in the same handwriting, and there is no indication Murillo read the answers or verified her statements were correctly recorded.

First, Murillo signed a record of sworn statement that she wished to make a statement regarding her marriage to Alabed.  (AR 807.)  Second, Murillo offered a second declaration in February 2012 recanting her statements about the sham nature of her marriage to Alabed.  This 2012 declaration acknowledges Murillo's statements regarding Alabed during the July 2000 interview.  (AR 501 ("I knew that Amjad was cheating on me and it really upset me.  I couldn't take it any longer.  I made up statements to immigration [in July 2000], [sic] so Amjad wouldn't get his papers.").)  Plaintiffs' argument that it is questionable whether Murillo made the statements recorded in July 2000 is insufficient to cast doubt upon whether Murillo actually made statements about the sham nature of her marriage to Alabed when Murillo herself acknowledges she made statements to USCIS that were adverse to Alabed in July 2000.

### d.       USCIS' Investigation of Murillo's I-130 Petition was Adequate

Finally, Plaintiffs also argue USCIS failed to conduct an adequate investigation into the facts and therefore arbitrarily relied on details and factual matters that were not properly and adequately investigated.  Plaintiffs assert that Botello testified that Alabed went to Jerusalem in 1999 to get married, but USCIS never investigated this alleged 1999 marriage.  Whether Alabed was lying about his 1999 trip to appease Botello in some manner or whether he actually was

married in Jerusalem in 1999, this alleged marriage has little bearing on Alabed's intent in marrying Murillo in October 1998.  While Plaintiffs note the record does not contain the pictures of Alabed's wedding in Palestine that Botello allegedly gave to USCIS, a copy of Botello's statement to the police regarding Alabed's theft report, a copy of the restraining order filed by Botello, a response from the US Postal Inspector, or any statement taken by Alabed with regard to the alleged fraud, USCIS was not required to investigate or follow-up on every detail of Botello's June 2000 statement, particularly as to details that were tangential to the issue of Alabed's marriage to Murillo in 1998.  While these details may bear on Botello's credibility, even if her June 2000 statement were entirely disregarded, there is still sufficient evidence in the record to uphold USCIS' decision.

Plaintiffs also note that USCIS did not attempt to obtain rental records from Hollywood Video, interview other inhabitants of the North Maple apartment complex or the manager of the property, nor did USCIS even attempt to get a copy of the lease.  (Doc. 40-1, 14:19-23.)  Whether or not Botello had moved all her belongings into the North Maple apartment or whether she only visited there as Alabed's girlfriend is not probative or dispositive as to Alabed's intent when he married Murillo in 1998.  The fact that Alabed acknowledged Botello as his girlfriend in 2000 and that Botello and Alabed had a joint PG&E account was sufficient to verify the existence of their relationship – further investigation into the precise details of their living arrangement was unnecessary to the issues before USCIS.   USCIS' failure to obtain additional evidence to corroborate every detail in Botello's statement does not establish USCIS' investigation was inadequate.[4]

Outside of his interview, Alabed has failed to submit any statement to USCIS about the nature of his relationship with Murillo, and Plaintiffs offer no argument why the inclusion of an interview statement from Alabed's interview would be necessary or required.  Further, while Plaintiffs note the record is missing a copy of the NOID denying Murillo's 1998 I-130 Petition on Alabed's behalf, they present no argument why this is significant to Hussein's I-130 Petition on

---

[4] Plaintiffs cite no authority that it is incumbent upon USCIS to investigate and corroborate each and every statement made by any affiant or declarant who offers evidence of the bona fides or sham nature of a beneficiary's marriage.

Alabed's behalf.  A decision on Murillo's I-130 Petition was issued in July 2000; there is no record of appeal of that decision, and thus it is final.  8 C.F.R. §1003.39.   Plaintiffs fail to explain how a procedural flaw in a prior final determination on a *different* petition bears on USCIS' decision on *this* petition.

### e. Conclusion

In sum, USCIS relied on substantial and probative evidence to support its finding of marriage fraud.  Substantial evidence showed that Alabed was involved with Botello in a relationship at the time he married Murillo, Murillo gave a sworn statement that her marriage to Alabed was not bona fide, Alabed and Murillo were unable to consistently answer simple questions about their residences and details of Alabed's 1999 trip, and there was scant evidence offered that the Alabed-Murillo marriage was a bona fide marriage.

### 2. There Was a Rational Basis to Find that Plaintiffs' New Evidence Did Not Rebut the Finding of Marriage Fraud

Upon USCIS citing substantial and probative evidence of marriage fraud, the burden shifted to Plaintiffs to rebut this finding.  *Matter of Kahy*, 19 I. & N. Dec. 803, 806 (B.I.A. 1988) ("[W]here there is evidence in the record to indicate that the beneficiary has been an active participant in a marriage fraud conspiracy, the burden shifts to the petitioner to establish that the beneficiary did not seek nonquota preference status based on a prior fraudulent marriage."); *Zemeka*, 986 F. Supp. 2d at   130 ("substantial evidence" supported shifting the burden to the petitioner to establish the prior marriage was bona fide).  Plaintiffs submitted new evidence and argument to rebut USCIS' finding with regard to Alabed and Murillo's marriage, which was not credited by USCIS.  Plaintiffs contend the USCIS did not adequately weigh or consider the evidence that rebuts its finding.

Plaintiffs submitted a February 2012 declaration from Botello recanting her prior sworn statement to USCIS stating she knew Alabed was married in June 2000, he had never talked about getting married to her, and never asked her to marry him for money.  (AR 503.)   Botello's declaration also states that in January 2000, she and Alabed had a "huge argument" about his wife, Botello became angry, and she turned Alabed over to immigration.  (AR 503.)  USCIS discredited

1  this new declaration because Botello's admission of giving false testimony undercut her newest

2  February 2012 declaration and the February 2012 declaration was not supported by any

3  corroborating documentation.

4       Plaintiffs also submitted a new declaration from Murillo signed in February 2012.

5  (AR 501.)  Although Murillo recanted her July 2000 statements to USCIS, her 2012 declaration is

6  short and bereft of any meaningful details, which USCIS noted.  (AR 495.)  For example, she

7  states she was upset because she discovered Alabed was cheating on her, but provides no details of

8  how she discovered this or why she agreed to go to the July 2000 interview to support the I-130

9  Petition submitted on his behalf.  Murillo initially attempted to answer USCIS' questions in a

10  manner beneficial to Alabed in July 2000, which is inconsistent with her 2012 statement that she

11  was so angry with Alabed for cheating on her at that time that she falsified details about Alabed

12  offering her money in return for marrying him.  USCIS noted this inconsistency in its decision

13  finding Murillo's February 2012 declaration not credible:  "If her new declaration is true and she

14  only wanted to hurt [Alabed] for cheating on her, why then did she attempt to provide false

15  statements in an attempt to prove a bona fide marriage?"  (AR 495.)  USCIS adequately

16  considered Murillo's February 2012 declaration and provided sufficient grounds to reject it.

17       USCIS also considered the other declarations offered by Alabed's family members as well

18  as that of Gloria Castillo.  Castillo's declaration was not given weight because it was not supported

19  or corroborated by any documentation.  (AR 495.)  The declarations from Alabed's family

20  members were also disregarded because they failed to provide any objective or credible evidence

21  that a bona fide marriage existed and, as family members, the declarations were considered self-

22  serving.  (AR 495.)  Adverse credibility determinations must be based on "specific, cogent

23  reason[s]," which USCIS provided here.  *Alvarez-Santso v. INS*, 332 F.3d 1245, 1254 (9th Cir.

24  2003).  These declarations all lacked sufficient details, contained no corroborating factual

25  documentation, and thus were rejected for specific and cogent reasons.

26       The USCIS' consideration of and its reasons for rejection of this evidence were rational,

27  and the USCIS' decision will not be overturned.  *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir.

28  1997) (to reject a decision by USCIS under the substantial evidence standard, "the evidence must

be so compelling that no reasonable fact-finder could fail to find the facts were as the alien alleged.").

### C.    Defendants are Entitled To Summary Judgment On Plaintiffs' Procedural Due Process Claim

Plaintiffs allege USCIS violated their due process rights in relying on Murillo's and Botello's testimony without permitting Plaintiffs the opportunity to cross examine them or the officer who took their statements.  (Doc. 1, ¶¶ 24-31.)

### 1.    Due Process Requirements Apply to USCIS' Consideration of Plaintiffs' I-130 Application

Plaintiffs argue that USCIS violated their due process rights by not permitting Plaintiffs to cross examine Botello, Murillo, and the agent who took their statements in 2000.  Plaintiffs contend that the Ninth Circuit's decision in *Ching v. Mayorkas* requires USCIS to conduct a hearing where it is not possible to determine whether witness statements are true simply by reading them.  Here, Botello and Murillo both signed new declarations in February 2012 indicating their statements in 2000 were false and the result of hurt feelings over their respective relationships with Alabed.  Plaintiffs contend the circumstances of this case dictate a hearing so that they can question Murillo, Botello, and the USCIS agent who interviewed Murillo and Botello.

The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. V.  To establish a violation of substantive or procedural due process, a plaintiff must show he or she has a "liberty or property interest protected by the Constitution."  *Ching*, 725 F.3d at 1155.  A plaintiff has a property interest in a benefit to which there is a "legitimate claim of entitlement."  *Id.*

In *Ching*, a U.S. Citizen, Elden Fong ("Fong"), submitted an I-130 visa petition for an immediate relative on behalf of his spouse, a Chinese native legally residing in the United States, Teresita Ching ("Ching").  *Id.* at 1153.  When Ching entered the United States, she began dating and ultimately married, Fong.  Fong submitted an I-130 visa petition on behalf of Ching, but Ching later informed USCIS she no longer wished the petition to be considered because Ching

1  planned to divorce Fong.  Ching and Fong divorced in December 2007, and Ching remarried

2  Brooke Joseph ("Joseph") who then submitted an I-130 visa petition on Ching's behalf.

3      The USCIS denied Joseph's I-130 petition because at an interview of Fong conducted by

4  USCIS, Fong confessed and provided a sworn statement that he and Ching had never

5  consummated their marriage, never lived together, and that Fong was offered and paid cash in

6  return for marrying Ching.[5]  Ching and Joseph responded to Fong's statement by submitting a

7  detailed declaration from Ching "describing in excruciating detail her intimate relationship with

8  Fong."  *Id.* at 1153.  The USCIS subsequently denied Joseph's I-130 petition on grounds that

9  Ching's first marriage was not entered into in good faith.  Although USCIS had reviewed Ching's

10  declaration, it was determined to be "self-serving."   Ching and Joseph challenged USCIS' denial

11  in federal district court asserting they had been denied their right to due process because they were

12  not given an opportunity to cross-examine Fong.  The district court held that Joseph and Ching did

13  not have a due process interest in the I-130 petition because there was not a liberty or property

14  interest at stake.

15      On appeal, the Ninth Circuit reversed the district court holding that a due process right did

16  exist.  Under the statute, USCIS was required to approve an I-130 petition if the requirements

17  were met, and thus the statute created a mandatory entitlement which was entitled to the

18  protections of due process.

19      In sum, grant of an I-130 petition for immediate relative status is a nondiscretionary

20      decision.  Immediate relative status for an alien spouse is a right to which citizen

    applicants are entitled as long as the petitioner and spouse beneficiary meet the

21      statutory and regulatory requirements for eligibility.   This protected interest is

    entitled to the protections of due process.

22

23  *Id.* at 1156.

24      The Ninth Circuit's decision in *Ching* recognizes a protected interest in an I-130 petition.

25  Thus, Plaintiffs are entitled to the protections of due process in the USCIS' consideration of their

26

27  [5] Fong's terse sworn statement included only the following:  "My name is Elden Fong and Teresita Ching were married [sic] in Oakland on January 7, 2005[,] in Oakland, CA.  Teresita and I never had sex.  Teresita and I never lived together.  $32,000 was offered and $14,000 was paid in cash/installments.  Teresita and I did not marry for love.  I regret in full marrying Teresita."  *Ching*, 725 F.3d at 1152.

28

I-130 petition.   The question, however, is *what* process is required to satisfy Plaintiffs' constitutional due process rights in this case.

### 2.   Due Process Does Not Require a Hearing and Opportunity for Cross-Examination Under the Circumstances of this Case

It is undisputed that Plaintiffs received all the process to which they are entitled by statute and regulation.   Plaintiffs were issued a NOID detailing the evidence USCIS found of marriage fraud pursuant to 8 C.F.R. § 103.2(b)(8)(iv).   The NOID advised Plaintiffs of the evidence of the fraud which included Alabed's and Murillo's inconsistent answers during their interviews, Murillo's and Botello's sworn statements indicating Alabed's marriage to Murillo was not bona fide, as well as the other evidence considered by USCIS.   Plaintiffs were provided an opportunity to respond to the NOID, USCIS considered the additional evidence they submitted, and USCIS issued a decision setting out its bases for the denial of the petition.   Plaintiffs were afforded the opportunity to appeal to the Board, which also issued a written decision.

Plaintiffs argue, however, that this process was not sufficient given the facts in dispute in this case.   Plaintiffs contend that in *Ching,* the contradictory statements of Fong and Ching made it impossible to determine which statement was true simply by reading them, and the Ninth Circuit held that due process thus required a hearing for Ching to confront Fong.   Plaintiffs assert this case is similar to *Ching* in that here there are contradictory statements in the record, the truth of which cannot be determined merely by reading them.   Both Murillo and Botello have submitted new declarations indicating their sworn statements to USCIS in 2000 were false and the result of hurt feelings arising from their respective relationships with Alabed.   In *Ching*, the Ninth Circuit recognized that it is not uncommon for a former spouse with hurt feelings to perjure himself through malicious, vindictive statements meant to hurt the other former spouse.   According to Plaintiffs, Botello's and Murillo's statements in June and July 2000 were the product of hurt feelings and were meant to punish or damage Alabed.   They have both recanted those statements in their February 2012 declarations, and the conflict between the 2000 statements and the 2012 declarations requires a hearing to determine which version is correct.

Defendants argue that *Ching* does not establish a general right to cross-examine adverse witnesses when USCIS adjudicates I-130 visa petitions.  Rather, determining what process is required must be made on a case-by-case basis, and will depend on the specific circumstances of each case.  To determine what process is required, the court must apply the factors identified in *Matthews v. Eldridge*.  Defendants maintain that, unlike *Ching*, the *Matthews* factors do not weigh in favor of additional process such as cross-examination of adverse witnesses when applied to the facts of this case.

"Due process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997).  It is not "a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886 (1961)).  To determine what process is required in any particular set of circumstances, three factors must be considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).  The Court assesses the application of these factors below and considers the Ninth Circuit's application of these factors in *Ching*.

### a.    Private Interest Factor

The first *Matthews* factor "is an assessment of the private interest that will be affected by the official action." *Id.* at 335; *Ching*, 725 F.3d at 1157.  In *Ching*, Joseph and Ching maintained that, without an I-130 approval, Ching faced imminent removal from the Unites States, which would undoubtedly cause immense hardship to Ching and Joseph.  The court observed that the right to marry and enjoy marriage are "unquestionably liberty interests protected by the Due Process Clause." *Id.* Because this right to live with and not be separated from one's immediate family was a right that "ranks high among the interests of the individual," the court held it could not be taken away without procedural due process.  As such, the court concluded the first *Matthews* factor favored Joseph and Ching.

1    Plaintiffs argue that because Defendants have previously placed Alabed in removal

2  proceedings following the denial of the previous I-130 petition, it is more likely than not that he

3  will be placed in removal proceedings again, forcing Plaintiffs to be separated.  In light of this, the

4  private interest factor favors Plaintiffs.  (Doc. 41, 13:1-16.)  Defendants argue that Alabed has not

5  currently been placed in removal proceedings, and contend that Plaintiffs' argument is an

6  unwarranted expansion of *Ching*'s analysis of the first factor to include cases where there is a mere

7  *possibility* of removal of the alien spouse.

8    Where the alien spouse is not currently in removal proceedings, as is the case here, it

9  cannot be argued that removal is *imminent* such that there is a significant risk that the alien and

10  citizen spouses will be forced to separate.  To find that even the potential of being placed in

11  removal proceedings creates an imminent risk of separation would expand the first element of

12  *Matthews* too far.  In *Matthews*, the Supreme Court required consideration of the private interest

13  that "will be" affected by the official action, not the private interest that *potentially or could be*

14  affected.  *Matthews*, 424 U.S. at 335.  The Court finds this factor does not favor additional process

15  under the circumstances of this case.

16    **b.    Risk of Erroneous Deprivation**

17    The second *Matthews* factor "is the risk of an erroneous deprivation of such interest

18  through the procedures used and the probative value of additional procedural safeguards."  *Ching*,

19  725 F.3d at 1157.

20    Defendants argue the circumstances and evidence in this case are materially different from

21  that of *Ching*.  In that case, the ex-spouse's sworn statement was obtained years after Ching had

22  remarried Joseph, and the court appeared more concerned with USCIS affording more credibility

23  to a spiteful ex-spouse's statement than to Ching's statement.  Here, Murillo's statement that the

24  marriage was fraudulent was obtained while she was still legally married to and petitioning for

25  Alabed.  Moreover, unlike *Ching*, USCIS did not rely solely on Murillo's statement to deny the

26  petition, but subpoenaed additional evidence to corroborate Murillo's admission that the marriage

27  was fraudulent.  Ching also provided her own sworn declaration describing her relationship with

28  her former spouse, while Alabed has provided no such declaration in this case.  Thus, the record

lacks compelling evidence to rebut the claim of marriage fraud that led the Ninth Circuit in *Ching* to find a high risk of erroneous deprivation when USCIS relied exclusively on the sworn statement from Fong.

Plaintiffs contend Defendants ignore the broader reasoning of *Ching* as follows.   In *Ching,* the court noted that in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.   Here, the witness testimony that the USCIS relied upon to find marriage fraud was recanted and the statements written by the USCIS were not actually what the witnesses had said.   The record simply does not support the findings made by the USCIS, and numerous documents are missing from the record.   Plaintiffs contend they have the right to question the USCIS officer who conducted the investigation and interviews of Murillo and Botello.   This is necessary because there are alleged documents in the investigative report that do not appear in the record, and the individuals who gave statements of marriage fraud contend their testimony was incorrectly recorded.

As noted by Defendants, this case is distinguishable from *Ching* in important aspects.   First, in *Ching*, Fong's declaration was the *only* evidence USCIS relied upon in finding the prior marriage a sham.   That declaration was limited to six sentences with no supporting details.   Here, the evidence that Alabed's marriage to Murillo was sham is significantly more than the single declaration offered in *Ching*.   As discussed above, there is evidence Alabed was involved with Botello at the time he married Murillo, Alabed and Murillo failed to give consistent answers at their interviews with USCIS in July 2000; Alabed referred to Botello as his girlfriend in a January 2000 police report, corroborating their romantic relationship; Botello and Murillo offered sworn statements that Alabed asked them to marry him to "fix" his immigration problems; and Murillo gave sworn testimony that she never loved Alabed, never lived with him, and she had married him to help him with his immigration status.   This is far more evidence than was relied upon by the USCIS in *Ching*, and thus the risk of an erroneous determination is much less than that in *Ching*.

1    Second, the evidence Plaintiffs offered to rebut the USCIS' finding is not compelling, in

2  contrast to the rebuttal evidence offered in *Ching*.  Ching provided a declaration detailing the first

3  time she and Fong consummated their marriage, and described

4           in vivid detail how the two would sleep in on weekends, have sex, and share
            intimate conversations. She described his underwear and recounted some of their
5           pillow talk.  She also went on to explain why the marriage deteriorated and
            eventually ended in divorce.  In addition, to corroborate her claim of a bona fide
6           marriage, she furnished photographs of the couple, joint utility bills, an apartment
            lease, and a letter Fong had previously written to USCIS stating that he and Ching
7           "truly loved each other."

8  *Ching*, 725 F.3d at 1153.  Here, Alabed did not submit detailed evidence supporting the bona fide

9  nature of his marriage to Murillo; indeed, Alabed has provided *no* declaration whatsoever

10  regarding the nature of his relationship with Murillo.  While Murillo's February 2012 declaration

11  recants her July 2000 statements that her marriage to Alabed was a sham, this 2012 declaration

12  offers absolutely no details of their life together or their decision to marry.  Murillo's February

13  2012 declaration states she was angry with Alabed and wanted to sabotage the immigration

14  petition, whereas at the July 2000 interview she appeared to *support* Alabed's petition.  Similarly,

15  Botello's February 2012 declaration indicates she said nothing more to USCIS when her sworn

16  statement was taken other than she was not related to Alabed and she did not know about his

17  marriage to Murillo.  However, her 2012 declaration is internally inconsistent in that she disavows

18  she told USCIS anything in June 2000 other than she was not related to Alabed and she did not

19  know he was married but then acknowledges she made statements to USCIS adverse to Alabed's

20  interests.  This is very different from the evidence offered by Ching to rebut USCIS' evidence of a

21  sham marriage.

22    Plaintiffs note that *Ching* specifically cited to U.S. Supreme Court case law holding that

23  "in almost every setting where important decisions turn on questions of fact, due process requires

24  an opportunity to confront and cross-examine adverse witnesses," *Ching*, 725 F.3d at 1156

25  (quoting *Kelly*, 397 U.S. 269), and thus because there are factual issues here involving the

26  testimony of a former spouse and a former girlfriend, a hearing is required.  *Ching*, however,

27  emphasized that the due process inquiry, particularly as applied to administrative proceedings,

28  must be made on a case by case basis.  *Id.* at 1157 ("Because of its inherent differences from the

judicial process, administrative proceedings in particular must be carefully assessed to determine what process is due given the specific circumstances involved.  And we must do so on a case by case basis.").  Plaintiffs' interpretation of *Ching* – that where important questions of fact turn on credibility, a hearing is required – is simply too broad as applied to the circumstances and facts presented in this case.

As to the probative value of additional procedural safeguards, Plaintiffs have failed to establish that cross-examination of Murillo and Botello would potentially change the outcome. Unlike in *Ching*, Alabed has offered additional declarations from his ex-spouse and ex-girlfriend recanting their prior sworn statements.  Thus, Alabed had access to Murillo and Botello whereas Ching apparently had no ability to obtain any further statements from her former spouse and it appeared cross-examination was the only opportunity the petitioner had to obtain additional evidence from the beneficiary's prior spouse.  More importantly, in light of the fact that Murillo and Botello both offered new declarations to support Alabed, Plaintiffs have not established what additional evidence would be obtained during cross-examination of these witnesses that was not already contained or could not have been contained in their February 2012 declarations to establish the bona fide nature of Alabed's marriage to Murillo.

Additionally, there is no credible evidence that the investigator failed to adequately capture Botello's and Murillo's June and July 2000 sworn statements such that cross-examination of the investigator may potentially change the outcome of the proceedings.  Both Botello and Murillo signed their respective statements in June and July 2000, which indicated they were given under oath.  (AR 755, 760, 807.)  In her February 2012 declaration, Botello maintains that when she was interviewed by USCIS in June 2000, she was only asked if she was related to Alabed and asked whether she knew if he was married.  (AR 504.)  However, this declaration was not given any weight by USCIS in light of Botello's admission she previously falsified her statements to USCIS. Moreover, her February 2012 declaration acknowledges she said more to USCIS in her June 2000 statement:  Botello states that after an argument about his wife, she "was so angry that [she] turned him over to the Immigration.  It was not right because we did not talk about marriage, but I guess I was really emotional."  (AR 503, ¶¶ 5-6.)  This statement acknowledges that Botello previously

told USCIS she and Alabed had plans to marry, but that this was a false statement because they never actually discussed marriage.  (AR 503.)  In other words, Botello states she told USCIS only two things in June 2000 (she was not related to him and she did not know he was married (AR 504)), but then states she turned Alabed over to immigration which "was not right" because they had never talked about marriage and she had fabricated that information because she "was really emotional."  In light of these internal inconsistencies, Botello's February 2012 declaration is not persuasive or compelling evidence that the investigator failed to properly and accurately record her sworn statement in June 2000.

While Plaintiffs argue that Murillo's sworn statement in July 2000 does not indicate her answers were read to her or accurately recorded, Murillo's February 2012 declaration does not state that her July 2000 statements were not made or were not properly recorded.  Rather, Murillo's February 2012 declaration attempts to explain *why* she gave the adverse statements about her marriage to Alabed in July 2000.  Plaintiffs have not established a basis to cross-examine the investigator who obtained Murillo's and Botello's statements in 2000 or shown how cross-examination of the investigator would potentially change the outcome.

In sum, the high risk of error in *Ching*, given the sole reliance on the agency of a former spouse's statement, is not present in this case given the substantial evidence supporting a sham marriage between Murillo and Alabed along with a lack of any detailed or convincing evidence rebutting this evidence.  Significantly, Plaintiffs have submitted additional declarations from Murillo and Botello and failed to state what further information would be obtained during cross-examination of these witnesses that could not have been placed in their 2012 declarations.  This factor weighs against the need to cross-examine these witnesses.

### c.      The Government's Interest

The final *Matthews* factor requires consideration of the Government's interests, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Id.* at 1158.  In the context of an I-130 petition, the court in *Ching* held that the government had a substantial interest in preventing marriage fraud, and additional procedures would entail the minimal cost to the government of holding an additional

1    hearing in the case.  The court concluded that additional procedures would entail only "relatively

2    slight" fiscal and administrative burdens.  In light of the Ninth Circuit's holding in *Ching*, this

3    factor favors Plaintiffs and additional process.

### d.    The *Matthews* Factors Do Not Favor Additional Process

5         In considering the *Matthews* factors, only the third factor weighs in favor of providing

6    Plaintiffs additional process in the form of another hearing with cross-examination of witnesses.

7    Alabed is not currently in removal proceedings which is distinguishable from *Ching*, and thus the

8    first factor does not weigh in favor of additional procedural safeguards to protect Plaintiffs'

9    privacy interest.   Because of the weight of the evidence supporting USCIS' fraudulent marriage

10   finding and the lack of evidence establishing Alabed and Murillo's marriage was bona fide, there

11   is a low risk of erroneous deprivation.  The value of additional procedural safeguards in the form

12   of an additional hearing with cross-examination has not been established.   Although the third

13   factor weighs in favor of additional process in every I-130 petition, it is outweighed here by the

14   weight of the first two factors.

### e.    Prejudice

16        Defendants note that a showing of prejudice is required to raise a due process challenge in

17   removal proceedings (*see Ramirez-Alejandrew v. Ashcroft*, 319 F.3d 365, 383 (9th Cir. 2003)), but

18   the court in *Ching* left open the question whether prejudice must be shown in I-130 petition cases.

19   *Ching*, 725 F.3d at 1156.  Prejudice can be shown by demonstrating that the violation of due

20   process will potentially affect the outcome of the proceedings.  *Id.* at 1157.

21        The Court agrees and finds that here, to the extent a showing of prejudice is required,

22   Plaintiffs have failed to show how the outcome of the proceedings would be potentially different if

23   cross-examination were permitted.  As discussed above, Botello and Murillo both submitted new

24   declarations in 2012 and thus they were available to Plaintiffs to obtain additional testimony

25   unlike in *Ching*.  Plaintiffs have not established what testimony would or could be obtained during

26   cross-examination that could not have been set forth in the 2012 declarations of Murillo and

27   Botello.  Plaintiffs have also failed to establish that there were any improprieties or irregularities

28   with regard to the sworn statements of either Botello or Murillo in 2000 such that cross-

examination of the investigator who obtained these statements would potentially result in a different outcome.

## V.   CONCLUSION

For the reasons set forth above, Plaintiffs have not established that USCIS' decision was arbitrary or capricious.   Therefore, Defendants are entitled to summary judgment on Plaintiffs' APA claim.   Further, Plaintiffs have not established that they were deprived of procedural due process.   Defendants are entitled to summary judgment on Plaintiffs' due process claim.

Accordingly, IT IS HEREBY ORDERED that:

1.   Plaintiffs' motion for summary judgment is DENIED;

2.   Defendants' motion for summary judgment is GRANTED;

3.   The Clerk of Court is DIRECTED to enter judgment for Defendants; and

4.   This case shall be administratively closed.

IT IS SO ORDERED.

Dated:   __April 24, 2015__                _____ /s/ Sheila K. Oberto__
                                                    UNITED STATES MAGISTRATE JUDGE